**INDIANA GAS COMPANY, INC.,**
**et al., Plaintiffs–Appellants,**

v.

**HOME INSURANCE COMPANY,**
**et al., Defendants–Appellees.**

Nos. 97–1328, 97–1381.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1998.

Decided April 6, 1998.

Opinion Denying Rehearing May 13, 1998.

---

Edward P. Henneberry, Mark Levy (argued), Howry & Simon, Washington, DC, for Indiana Gas Co., Inc., Richmond Gas Corp. and Terre Haute Gas Corp.

Roger E. Warin, Harry Lee (argued), Steptoe & Johnson, Washington, DC, for Home Ins. Co.

Thomas J. Quinn, Stephen T. Roberts (argued), Mendes & Mount, LLP, New York City, James E. Rocap, Jr., Kandi Kilkelly Hidde, Rocap, Witchger & Threlkeld, Indianapolis, IN, for Certain Underwriters at Lloyd's London and Certain London Market Ins Companies.

James S. Stickles, Jr., Johnson & Bell, Chicago, IL, for Ranger Ins. Co.

Mary K. Reeder, Riley Bennett & Egloff, Indianapolis, IN, Sonia S. Waisman (argued), Kathy Pisula Waring, Luce, Forward, Hamilton & Scripps, San Diego, CA, for St. Paul Fire & Marine Ins. Co.

Before POSNER, Chief Judge, and EASTERBROOK and EVANS, Circuit Judges.

EASTERBROOK, Circuit Judge.

Long ago, predecessors to Indiana Gas Company manufactured gas by heating coal and oil at nine sites in Indiana. The principal residual was coal tar, a sludge containing pitch plus pyridine and additional organic compounds that are raw materials for the production of paints, dyes, plastics, pharmaceuticals, and other synthetic products. Some coal tar was discarded before these beneficial uses were discovered, additional byproducts of gas manufacturing were not suitable feedstocks for other industries, and at all events production often exceeded the demand. What could not be sold or given away was placed in containment structures of various kinds, from which it has begun to leak. At two sites (and perhaps others) residuals were placed in holder pits and used as fill to level off the ground. Coal tar has some dangerous constituents, so Indiana Gas faces cleanup costs, for which it sought indemnity from its insurers. When the insurers refused, Indiana Gas and affiliated companies (collectively "Indiana Gas") initiated this comprehensive action against many of the firms that issued policies over the course of the last century, seeking a declaratory judgment that would require them to cover the cleanup costs and liability to third parties that Indiana Gas foresees. In order to resolve the suit the district court addressed many issues, such as whether the coal tar's escape was inevitable or may be characterized as an "accident" covered by the policies, and if so whether the pollution exclusions in many of the policies negate indemnity. After 11 published opinions terminated most claims in defendants' favor, 946 F.Supp. 627; 946 F.Supp. 639, 951 F.Supp. 759; 951 F.Supp. 820, settlements were reached on the rest, and Indiana Gas has appealed.

Searching for a comprehensive solution to insurance-coverage questions creates a potential problem when jurisdiction depends on 28 U.S.C. § 1332 (in this case, § 1332(a)(3)). The more defendants, the more likely it is that one of them will have the same citizenship as one of the plaintiffs, spoiling the

"complete diversity" that under *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), is essential. Plaintiffs are incorporated and have their principal places of business in Indiana, so the suit is untenable if any defendant must be treated as a citizen of Indiana. The complaint named among the defendants "Certain Underwriters at Lloyd's, London" and "Certain London Market Insurance Companies." Which underwriters and companies are the "certain" underwriters and companies? What kinds of entities are they, and what rules govern ascertainment of their citizenships? The complaint does not say, and the district judge did not require Indiana Gas to be more specific. The London Market Insurers inform us that all but five of the "companies" are corporations organized under the law of the United Kingdom, with principal places of business there, and that none of the five domestic corporations is incorporated or has a principal place of business in Indiana. But what is the citizenship of the "underwriters"? A syndicate that underwrites insurance through the exchange at Lloyd's can have hundreds of members (known as "names"), located throughout the world, and any given policy is underwritten by multiple syndicates. Indiana Gas's brief asserts: "Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurers ("London") are various corporations and syndicates, none of which is incorporated or maintains its principal place of business in Indiana." This treats each syndicate as an entity with a single citizenship taken from its principal place of business. The London Market Insurers' brief, by contrast, treats the syndicates as unincorporated associations: "Underwriters at Lloyd's, London, defendants below, are natural persons and sole traders, subscribing to policies of insurance each for his or her own part and not one for the other. They are members of various syndicates which are located in and have their principal place of business in London, England." On this view the right parties are not the syndicates but either (a) the persons who subscribed to the policies on behalf of the syndicates, or (b) all of the names.

Every name in a syndicate faces unlimited personal liability, like a partner in a general partnership. Syndicates are run, however, much like limited partnerships, with a lead member (the "active underwriter" or "managing agent") able to transact business without consulting the investors. Descriptions of the London insurance market and the organization of underwriting syndicates at Lloyd's may be found in *Daly v. Lime Street Underwriting Agencies Ltd.*, [1987] 2 FTLR 277 (Q.B.); *John Hayter Underwriting Agency Ltd. v. R.B.H.S. Agencies*, [1977] 2 Lloyd's Rep. 105 (C.A.1976); and *Edinburgh Assurance Co. v. R.L. Burns Corp.*, 479 F.Supp. 138, 145–46 (C.D.Cal.1979), affirmed (with an immaterial exception), 669 F.2d 1259 (9th Cir.1982).

Corporate citizenship is specified by 28 U.S.C. § 1332 (c)(1): a corporation is deemed a citizen of the jurisdiction where it is incorporated, plus the jurisdiction in which it has its principal place of business. Unincorporated business entities, however, are treated as citizens of every jurisdiction in which any equity investor or member is a citizen. Thus both general and limited partnerships are citizens of every jurisdiction of which any partner is a citizen. *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990); *Guaranty National Title Co. v. J.E.G. Associates*, 101 F.3d 57 (7th Cir.1996). Membership associations such as labor unions, joint stock companies, and joint ventures take the citizenship of each member. *United Steelworkers v. R.H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965); *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900). Underwriting syndicates are not corporations, and, because a court has a duty to ensure that subject-matter jurisdiction is present even if the parties disregard the issue, we inquired at oral argument whether, when this case began (the only relevant time, see *Denlinger v. Brennan*, 87 F.3d 214 (7th Cir.1996)), any of the names in any of the syndicates was a citizen of Indiana. None of the lawyers knew, so we directed Indiana Gas and the London Market Insurers to supplement the record with the necessary information. We also extended to Indiana Gas the option of dismissing the London syndicates in order to

ensure complete diversity and permit final resolution of its claims against its other insurers, see *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), and offered all parties an opportunity to address the legal significance of the names' citizenship.

All parties other than Indiana Gas and the London Market Insurers have passed on the opportunity to discuss the jurisdictional consequences of the names' citizenship, although the issue imperils the judgment with respect to every party. After a search of their records, the London Market Insurers inform us that "there is at least one subscribing name who was domiciled in Indiana as of the date of the filing of the Complaint." For its part, Indiana Gas has volunteered to dismiss any names who were citizens of Indiana when the complaint was filed. This offer is pointless, for the names are not parties to begin with and therefore cannot be dismissed. Either the active underwriters or the syndicates are the right parties; no view of the situation makes the names parties in their own right. It may be that the active underwriters or syndicates have multiple citizenships, but this does not imply that there are multiple parties. See *Carden,* 494 U.S. at 190 n. 2, 110 S.Ct. at 1019 n. 2. Indiana Gas can no more dismiss individual names than it could sue a partnership and "dismiss" any partners who are citizens of Indiana. A syndicate is in or out as a unit. Indiana Gas had a chance under *Newman–Green* to dismiss the London underwriting syndicates, so that it could proceed against the other insurers. It elected not to do so. As a result, we must decide whether the citizenship of the underwriters is the citizenship of every name, or only of the active underwriter who acts as the managing agent.

An underwriting syndicate at Lloyd's has the personal-liability characteristics of a general partnership and the management structure of a limited partnership. It is not incorporated and does not have the structure of a trust—to quote again from the London Market Insurers' brief, the names "are natural persons and sole traders, subscribing to policies of insurance *each for his or her own part* and not one for the other. They are *members* of various syndicates" (emphasis added). General partnerships, limited partnerships, joint stock companies, and unincorporated membership associations all are treated as citizens of every state of which any partner or member is a citizen. See *Carden* (general and limited partnerships); *Bouligny* (unincorporated associations); *Chapman v. Barney,* 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889) (joint stock company). It follows that the underwriting syndicates have the citizenships of every name. (They could have other citizenships as well. Section 1332(c)(1) creates a special rule for insurers in "direct actions"—that is, cases in which a person with a claim against the insured sues the insurer directly. In direct actions insurers have not only their normal citizenship(s), but also the citizenship(s) of the insured. But as this is not a direct action, this aspect of § 1332(c)(1) does not matter.)

Both Indiana Gas and the London Market Insurers observe that English law permits the active underwriters to sue and be sued as representatives of the names, but the fact that the names are not parties does not distinguish the syndicates from partnerships, which (depending on the jurisdiction) are sued either in their own names or in the names of selected partners. Likewise the fact that the underwriting syndicates are unusual organizations, with some properties of general partnerships, some of limited partnerships, some of joint stock companies, and some of trusts (on which more below) does not affect the jurisdictional inquiry. *Carden* articulated a general rule: *every* association of a common-law jurisdiction other than a corporation is to be treated like a partnership. The reference to "common-law jurisdiction" in the preceding sentence acknowledges the holding of *Puerto Rico v. Russell & Co.,* 288 U.S. 476, 53 S.Ct. 447, 77 L.Ed. 903 (1933), that the civil-law entity known as a *sociedad en comandita* is to be treated like a corporation. *Carden* tells us that this holding is not to be extended:

> *Bouligny*[,] ... in reaffirming "the doctrinal wall of *Chapman v. Barney,*" ... explained *Russell* as a case resolving the distinctive problem "of fitting an exotic creation of the civil law ... into a federal scheme which knew it not." 382 U.S., at

151. There could be no doubt, after *Bouligny*, that at least common-law entities (and likely all entities beyond the Puerto Rican *sociedad en comandita*) would be treated for purposes of the diversity statute pursuant to what *Russell* called "the tradition of the common law," which is "to treat as legal persons only incorporated groups and to assimilate all others to partnerships." 288 U.S., at 480.

494 U.S. at 190, 110 S.Ct. at 1018 (footnote omitted). This approach reflects a strong reluctance to extend the diversity jurisdiction by judicial interpretation—a reluctance that has characterized the Supreme Court's jurisprudence ever since *Strawbridge* held that complete diversity is essential. Congress may choose to establish special rules for some kinds of associations, as it has done in § 1332(c) for corporations, decedents' estates, and insurers named as defendants in direct actions, but when the statute is silent we apply the norm that all unincorporated associations are treated as partnerships.

■ This sets up the London Market Insurers' principal position: that the syndicates are not juridical entities—they can't sue or be sued—and therefore are not "associations" at all. They must be treated like trusts, the argument goes, because the active underwriters serve the function of trustees protecting the interests of the other names and litigating on their behalf. Trusts take the citizenship of the trustees rather than of the beneficiaries. *Navarro Savings Association v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). One difficulty with the London Market Insurers' position is that English law denies that the syndicates are trusts, or the active underwriters trustees. *Boobyer v. Holman & Co.,* [1993] 1 Lloyd's Rep. 96 (Q.B.1992). *Navarro* dealt with an "express trust" (446 U.S. at 462, 100 S.Ct. at 1782); whatever the syndicates may be, they are not express trusts. A second problem is that the agreements between the names and the active underwriters treat the active underwriters as agents. A typical contract delegates authority to

appoint or employ any person firm or body corporate to carry on or manage the underwriting or any part of it and may delegate to or confer upon any such person firm or body corporate all or any of the powers authorities discretion rights and duties given to the Agent by [the names' agency agreement].

Trustees, by contrast, are principals, owning and managing a defined pool of assets. And this gets to the third difference. Trustees *own* the corpus; ownership is what distinguishes a trustee from an agent. Active underwriters commit the wealth of the syndicates' names to fulfilment of the policy, which makes the insurance valuable to the customer, but the active underwriters do not own this wealth or exercise over it any dominion other than the power to underwrite risks. The difference between management of the names' assets and ownership of a corpus has a jurisdictional consequence. *Navarro* qualified its discussion as one dealing with "trustees whose control over the assets *held in their names* is real and substantial." 446 U.S. at 465, 100 S.Ct. at 1784 (emphasis added). Otherwise any unincorporated association could avoid *Strawbridge* by naming an agent or attorney to act on behalf of all members. Consider the arrangement in *Northern Trust Co. v. Bunge Corp.,* 899 F.2d 591 (7th Cir.1990): Shareholders in a closely held corporation appointed the trust department of a bank as their agent to negotiate the sale of their interests. When a question later arose about a warranty in the acquisition, the bank brought suit as agent for all of the selling stockholders. We held that the citizenship of the bank, as agent, was the citizenship of each investor. 899 F.2d at 594–96. The bank did not own the stock and therefore was not a trustee, we concluded; and if it was not a trustee then it was an agent for an unincorporated association, to which the approach of *Bouligny* was applicable. English law treats the active underwriters as agents for the names in much the way the bank was agent for the investors. If the bank was not acting as a trustee, the active underwriters also are not trustees.

■ *Certain Interested Underwriters at Lloyd's v. Layne,* 26 F.3d 39 (6th Cir.1994), treats the active underwriters as agents for the names, which the court considered to be

"undisclosed principals." Applying the "venerable common law rule that an agent for an undisclosed principal is personally liable on a contract" (26 F.3d at 43), *Layne* concludes that the citizenship of the names is irrelevant. This supposes that the names are not liable if they are not sued, and that if they aren't exposed to loss their citizenship doesn't count. This is problematic under American law—limited partners can't be sued for the partnership's acts and are not exposed to damages beyond loss of their investments, yet their citizenship counts. What is more, the intersection of English law with the sixth circuit's rationale produces an unfortunate implication. Recall that under English law the names *cannot* be sued by insureds. If inability to sue them personally means that their interests are not affected by the litigation, it would follow that no insured could rely on their promises or use their wealth to support the insurance agreement. No surprise therefore that the London Market Insurers embrace the result of *Layne* but not its rationale, which would make policies written on the London market less valuable to insureds. Yet the syndicates need not fear that *Layne's* rationale will wipe out their business, for *Layne* is mistaken. The proposition that an agent for an undisclosed principal *is* liable does not imply that the undisclosed principal is *not* bound by the contract; the full statement of the "venerable rule" is that both agent and principal are bound. See *Restatement (2d) of Agency* §§ 186, 302. When the principal's interests are affected by the litigation, the principal's citizenship counts even if the agent is the sole litigant. So we held in *Northern Trust,* a case the sixth circuit did not mention.

■ *Layne* is the only appellate opinion that has discussed syndicates' citizenship under § 1332. District courts are split. Some analogize the active underwriters to trustees, while others think that the syndicates should be treated as partnerships. Many courts of appeals, including this one, see *Certain Underwriters of Lloyd's v. General Accident Insurance Co.,* 909 F.2d 228 (7th Cir.1990), have resolved litigation by or against London syndicates under § 1332, but none discusses the potential significance of the names' citizenship, and therefore none expresses a holding on the subject. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 119 & n. 29, 104 S.Ct. 900, 918 & n. 29, 79 L.Ed.2d 67 (1984); *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37–38 & n. 9, 73 S.Ct. 67, 69–70 & n. 9, 97 L.Ed. 54 (1952); *R.R. Donnelley & Sons Co. v. FTC,* 931 F.2d 430, 433 (7th Cir.1991). See also *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925). For all we can tell, in cases such as *General Accident* none of the names in the syndicates that underwrote the policy had the same citizenship as an insured, so the question could not have arisen. *Dresser Industries, Inc. v. Underwriters at Lloyd's of London,* 106 F.3d 494 (3d Cir. 1997), on which Indiana Gas relies, likewise does not address the subject. *Dresser* holds only that jurisdiction is not spoiled by the presence of an alien on both sides of the case, if the parties are otherwise of diverse citizenship. Accord, *Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.,* 10 F.3d 425, 427–28 (7th Cir.1993). The third circuit did not discuss the role of the names' citizenship. On that subject *Layne* stands alone among appellate decisions—and we conclude that it stands incorrectly. We disagree with *Layne* and hold that the underwriting syndicates must be treated like partnerships when determining their citizenships.*

Citizens of Indiana are on both sides of this case, which therefore may not be maintained under § 1332. The judgment of the district court is vacated, and the case is remanded with instructions to dismiss for want of subject-matter jurisdiction.

EVANS, Circuit Judge, dissenting.

Good lawyers—and Mark Levy, the attorney for the Indiana Gas Company, is certainly nothing if not a mighty good lawyer[1]—

---

* Because this conclusion creates a conflict among the circuits, this opinion was circulated before release to all judges in active service. See Circuit Rule 40(e). A majority did not favor a hearing by the full court. Circuit Judges Kanne and Evans voted for rehearing en banc.

1. Mr. Levy, a former Deputy Assistant Attorney General for appellate matters in the Civil Division of the Justice Department and presently a

often spend the evening before an appellate oral argument trying to anticipate the sort of questions they may be asked by the judges the next morning. This case undoubtedly got Levy thinking about esoteric things like the fine points of hydrology and mundane things like pollution exclusions in insurance policies.

But surprise surprise. Forty-five seconds into Mr. Levy's argument, a question arrived from deep in the left field corner: "How do we know there is subject matter jurisdiction in this case?" Today the court answers its own question: There is no federal jurisdiction. So, despite the fact that the complaint alleged an arguable basis for diversity jurisdiction, the answers conceded jurisdiction, the district judge nurtured the case for three years and the parties came here looking for answers to questions on the merits of this complex litigation, we tell everyone they wasted their time. The district court, we hold, didn't have jurisdiction from the get-go, so close the hymnals because mass is over. Go home. Case dismissed. Three years of work in the district court getting the case to this point are washed down the drain. Because this result is unacceptable, I dissent.

The majority correctly notes that we have "a duty to ensure that subject-matter jurisdiction is present even if the parties disregard the issue...." Op. at p. 316. But having a *duty* and going so far beyond its call are not the same thing.

In establishing the requirement of "complete diversity" and finding it lacking 190 years ago in *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), Chief Justice Marshall did no more than look at the complaint which showed Massachusetts plaintiffs suing Massachusetts defendants plus someone (Curtiss) from Vermont. Today, in finding "complete diversity" to be absent, our court goes through a very elaborate academic exercise. First it pooh-poohs

the unchallenged allegation in the complaint that none of the various entities (Certain Underwriters at Lloyd's, London and Certain London Market Insurers) are, for diversity purposes, from Indiana. Next, it pays no heed to the fact that many federal courts, including ours in *Certain Underwriters of Lloyd's v. General Accident Insurance Co.*, 909 F.2d 228 (7th Cir.1990) (Bauer, J.), have resolved litigation on the merits in similar diversity cases against London syndicates. Finally, the court goes out of its way to distinguish *Certain Interested Underwriters at Lloyd's v. Layne*, 26 F.3d 39 (6th Cir. 1994)—where a jurisdictional objection *was* raised and rejected-while on its way to creating a conflict among the circuits.

I prefer to do none of these things. I would follow, at this time, the holding of *Layne* and resolve this dispute on the merits. To do otherwise makes the professionals in this case—a bevy of top-notch lawyers and an experienced and able district judge—look, unfairly, as if they were slipshod in discharging their responsibilities for failing to note that for over a thousand days this case had no business being in a federal court.

On Petition for Rehearing

May 13, 1998.

EASTERBROOK, Circuit Judge.

■ Our opinion in this case concludes that underwriting syndicates at Lloyd's of London must be treated like limited partnerships for purposes of determining their citizenship when jurisdiction depends on 28 U.S.C. § 1332. This means that each syndicate has the citizenship of each participating "name". Because at least one name in one of the defendant syndicates was domiciled in Indiana when the case began, the complete diversity essential to jurisdiction under § 1332 was missing. The London Market Insurers, alone among the many parties to

partner at Washington, D.C.'s Howrey & Simon, is one of the country's premier appellate litigators. *See The National Law Journal*, July 31, 1995. But by highlighting Mr. Levy, I don't mean to slight the other attorneys who argued this case before our panel. Harry Lee, Stephen Roberts, and Sonia Waisman, from powerhouse law firms (Steptoe & Johnson LLP, Washington,

D.C.; Mendes & Mount, LLP, New York, New York; and Luce, Forward, Hamilton & Scripps, LLP, San Diego, California, respectively) all appear to be top-notch lawyers. And obviously the district judge, William Lee (Yale University, B.A., 1959; University of Chicago Law, J.D., 1962), a grizzled veteran of 17 years on the district court bench, is no slouch as well.

the case, have filed a petition for rehearing. The London Market Insurers now advance an argument omitted from the jurisdictional memorandum submitted before our initial decision: that, as unincorporated associations, the underwriting syndicates could be sued as defendant classes under Fed. R.Civ.P. 23.2, with the names' citizenships ignored. An argument made for the first time in a petition for rehearing has been forfeited, and the London Market Insurers confront the further problem that the complaint did not use Rule 23.2. Plaintiffs have several ways to bring partnerships and other unincorporated associations into litigation— such as suing the entity in its own name, suing every partner or member, suing one member of the association as representative of the others, and suing one partner as an individual while allowing that partner to seek indemnity from others. The choice of device may affect "service of process, venue, subject matter jurisdiction, and the enforceability of the judgment." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7C *Federal Practice and Procedure* § 1861 at 215 (2d ed.1986). Rule 23.2 was not used in this case, and that is that.

Lest this invite another round of litigation in which Indiana Gas tries out Rule 23.2, we add that the London Market Insurers are mistaken in thinking that the Supreme Court's cases treating unincorporated associations as citizens of every state of which any member is a citizen may be avoided by suing one partner or member as a "representative" of the rest. The complete-diversity requirement cannot be transmuted into a minimal-diversity requirement so easily. Recall that the names are not parties in the first place. This *is* representative litigation. Indiana Gas correctly concluded that Fed.R.Civ.P. 17(b) permits suit against the syndicates through their lead underwriters, because the law of the United Kingdom permits the lead underwriters to represent the other names' interests—indeed, English law forbids suits by insureds directly against the names. Thus we had to decide what citizenship(s) should be attributed to the lead underwriters or other representatives of the syndicates. These representatives would have the same citizenships whether Rule 17(b) or Rule 23.2

was invoked. See also *Northern Trust Co. v. Bunge Corp.*, 899 F.2d 591 (7th Cir.1990).

According to the London Market Insurers, "Fed.R.Civ.P. 23.2 provides a jurisdictional basis for this action." Yet how can a rule of procedure expand the subject-matter jurisdiction of the federal courts? Rule 82, which the London Market Insurers do not mention, is emphatic that it cannot: "These rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein." *Supreme Tribe of Ben–Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921), on which the London Market Insurers rely, does not imbue Rule 23.2 with jurisdictional consequences. The Court held in *Cauble* that if there is complete diversity between named class representatives and the adverse parties, the district court may adjudicate the rights of other class members under its supplemental jurisdiction. In this sense the citizenship of class members who are not parties is irrelevant. *Cauble* deals with a situation in which the parties have independent claims, which could be fully resolved if other persons similarly situated were unaffected by the case. When the litigant comes to court *only* as a representative, without claims of his own, then it is essential to know what citizenship(s) this person has as representative. Otherwise all of the rules discussed in our initial opinion would collapse. Suppose a big Chicago law firm wanted to sue its landlord, a real estate partnership, under the diversity jurisdiction. A partner of the law firm who is a citizen of Indiana would sue as "representative" of the firm under Rule 23, naming a partner of the real estate syndicate who lives in Illinois as "representative" under Rule 23.2, and ask the judge to ignore the citizenships of the other partners on both sides. Yet that could not be described as a use of the supplemental jurisdiction: the only claim would be a representative one, on which complete diversity could not be established. Just so with suits by and against unincorporated insurance syndicates. Indiana Gas does not have claims against the lead underwriters, to which claims against names might be appended using 28 U.S.C. § 1367. It has claims against the underwrit-

ers of the policies of insurance, which is to say the syndicates as entities. So Rule 23.2 and *Cauble* are irrelevant, and the petition for rehearing is denied.

Circuit Judge Evans votes to deny the petition for rehearing but does not join this opinion.